# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| SHAWKAT ABBAS AND WEEAM AHMAD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Case No. 3:24-cv-01283** |
| v. | ) | **Judge Aleta A. Trauger** |
| | ) | |
| TRUIST BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiffs, husband and wife Shawkat Abbas and Weeam Ahmad, are customers of defendant Truist Bank ("Truist").[1] (Complaint ¶¶ 1, 5, 14.)[2] After the plaintiffs' safe deposit box went missing from Truist's bank branch, and having received unsatisfactory responses from Truist, the plaintiffs sued in state court. Truist removed and has filed a Motion to Compel Arbitration and Stay Case (Doc. No. 10) under the Federal Arbitration Act. The plaintiffs argue that the box's lease and governing rules contain no arbitration provision and do not incorporate one by reference, so they need not arbitrate. Truist argues that, years before the plaintiffs leased the safe deposit box, they opened a Truist deposit account, the terms of which, updated over the years, includes an arbitration agreement that requires the arbitration of any claim that "arises out of or relates to . . .

---

[1] Truist's predecessor in interest is SunTrust Bank. (Doc. No. 1 ¶ 9.) For purposes of the pending motion, corporate history is irrelevant, so the court will refer collectively to Truist and SunTrust Bank as "Truist" and the defendant's Smyrna, Tennessee branch as "the bank."

[2] The Complaint is in the record at Doc. No. 1-1 at 5–11.

any aspect of [the parties'] relationship." (Doc. No. 11-2 at 54, 2024 Rules & Regulations at 2.)[3] Truist argues that the claims here (necessarily) arise from the "parties' relationship" and that, because the plaintiffs have refused to arbitrate, the court must order them to.

For the reasons set forth herein, the Motion to Compel Arbitration and Stay will be denied.

## I. FACTS AND PROCEDURAL HISTORY

According to the Complaint, on Friday, December 31, 2021, Ahmad went to the bank to access the plaintiffs' safe deposit box. (Complaint ¶ 7.) Ahmad presented her key to a bank employee, who used it, with the bank's key, to open the safe deposit box's door. (*Id.* ¶¶ 9–11.) On the other side of the door should have been the plaintiffs' box, but it was missing. (*Id.* ¶ 12.) Soon after, the plaintiffs sent Truist a letter asking it to figure out what happened and to return their property. (*Id.* ¶ 16 (citing Doc. No. 1-1 at 16).) At the end of January, plaintiffs' present counsel sent Truist the box's inventory. (Doc. No. 1 ¶ 11 (citing Doc. No. 1-2 at 2–4).) According to the plaintiffs, the box contained family heirloom jewelry worth $465,000, handwritten Iraqi land contracts worth $850,000,[4] and other important documents and objects. (Doc. No. 1-1 at 16; Doc. No. 1-2 at 2–4.)

The plaintiffs allege that Truist neither explained what happened nor recovered their property (Complaint ¶ 17), so they filed a civil warrant in the General Sessions Court for Rutherford County, Tennessee. (*Id.* ¶ 19.) In response, Truist requested that the plaintiffs return to the bank, which they did, on April, 13, 2022. In the presence of defense counsel, a bank employee again used the parties' keys to open the box's door, revealing an empty slot where the plaintiffs' box ought to have been. (*Id.* ¶¶ 21–22.) The plaintiffs do not allege what happened during the next

---

[3] The 2024 Rules & Regulations are in the record at Doc. No. 11-2 at 50–94.

[4] The letter implies that the land is lost without the original documents. (*See* Doc. No. 1-2 at 3.)

two and one-half years, but they do allege that Truist has "provided no explanation, reasonable or otherwise, for the missing safety deposit box." (*Id.* ¶ 23.) And, the Complaint alleges, Truist suggested that the plaintiffs "either allowed or caused the safety deposit box to be missing," which the plaintiffs deny. (*Id.*)

On September 23, 2024, the plaintiffs sued Truist in the Chancery Court for Rutherford County, Tennessee. The plaintiffs allege negligent bailment (*id.* ¶¶ 26–32), negligence and gross negligence (*id.* ¶¶ 33–41), and breach of contract (*id.* ¶¶ 42–51). The plaintiffs seek compensatory damages and costs. (*Id.* at 10.)

Truist timely removed under 28 U.S.C. §§ 1332, 1441. (Doc. No. 1.) There is no dispute that the court has diversity jurisdiction. Truist has now filed a Motion to Compel Arbitration and Stay (Doc. No. 10), an accompanying Memorandum (Doc. No. 11), a Declaration (Doc. No. 11-1), and Exhibits (Doc. No. 11-2), to which the plaintiffs have filed a Response (Doc. No. 15) and Exhibits (Doc. No. 15-1) and the defendant has filed a Reply (Doc. No. 17).

## II.    STATUTORY BACKGROUND AND LEGAL STANDARDS

### A.    The Federal Arbitration Act

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "establishes a liberal federal policy favoring arbitration agreements." *Fleming v. Kellogg Co.*, No. 23-1966, 2024 WL 4534677, at *3 (6th Cir. Oct. 21, 2024) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018)) (internal quotation marks omitted).

Section 2 is the FAA's "primary substantive provision," "centerpiece provision," and "substantive mandate." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Vaden v. Discover Bank*, 556 U.S. 49, 64 (2009) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985)) (internal quotation marks omitted); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629 (2009). It provides that any agreement to arbitrate

3

falling under the statute "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Courts must "place[] arbitration agreements on an equal footing with other contracts." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citations omitted). Thus, "[c]ourts must, consistent with this text, 'rigorously enforce' arbitration agreements according to their terms." *In re: Auto. Parts Antitrust Litig.*, 951 F.3d 377, 381 (6th Cir. 2020) (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (additional internal quotation marks omitted); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019) ("[C]ourts must enforce arbitration contracts according to their terms."). "To enforce this dictate, the [FAA] provides . . . for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 416 (6th Cir. 2011) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). Section 3 requires courts to "stay the trial of" any suit "brought . . . upon any issue referable to arbitration under an agreement . . . until such arbitration has been had." 9 U.S.C. § 3. Section 4 allows parties "aggrieved by" another's "failure . . . or refusal . . . to arbitrate" under an arbitration agreement to petition a court "for an order directing that such arbitration proceed." *Id.* § 4.

## B. The Enforcement of Arbitration Agreements

The FAA "reflects the fundamental principle that arbitration is a matter of contract." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147 (2024) (quoting *Rent-A-Center*, 561 U.S. at 67). Thus, despite the FAA's liberal federal policy favoring arbitration agreements, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986); *see also GGNSC Louisville Hillcreek, LLC v. Est. of Bramer*, 932 F.3d 480, 485 (6th Cir. 2019) ("An agreement to arbitrate is fundamentally a matter of consent."). Thus, while the FAA "requires district courts to compel

4

arbitration of claims covered by a valid arbitration agreement," *Bazemore v. Papa John's U.S.A., Inc.*, 74 F.4th 795, 798 (6th Cir. 2023) (citing 9 U.S.C. § 4), a court "may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *In re: Auto. Parts*, 951 F.3d at 382 (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)) (emphasis in *Granite Rock*). Put another way, while the FAA "requires a court to summarily compel arbitration upon a party's request, the court may do so only if the opposing side has not put the making of the arbitration contract 'in issue.'" *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 835 (6th Cir. 2021) (quoting 9 U.S.C. § 4).

"Under the Federal Arbitration Act, courts considering a motion to compel arbitration engage in a limited, two-step review." *Adelstein v. Walmart Inc.*, 728 F. Supp. 3d 762, 767 (N.D. Ohio 2024) (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 612 (6th Cir. 2003)). "[T]o compel arbitration under the FAA, a court must conclude that (1) the parties agreed to arbitrate [and] (2) their agreement covers the claims at issue."[5] *Gavette v. United Wholesale Mortg., LLC*, No. 24-1557, 2025 WL 318224, at *1 (6th Cir. Jan. 28, 2025) (citing *Stout*, 228 F.3d at 714).

First, "[t]he party seeking arbitration must prove that such an agreement exists." *Bazemore*, 74 F.4th at 798 (citing *Boykin*, 3 F.4th at 839; *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th Cir. 2016)). The party moving to compel arbitration must therefore present some evidence that the parties agreed to arbitrate. *See Morris v. Serv. Experts Heating & Air Conditioning LLC*, No. 3:23-CV-00642, 2023 WL 8851611, at *5 (M.D. Tenn. Dec. 21, 2023).

---

[5] *Gavette* enumerates at third requirement: that Congress intended the claims at issue to be arbitrable. *Gavette*, 2025 WL 318224, at *1. But consideration of that element is only necessary "*if* federal statutory claims are asserted," which is not the case here. *See Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (emphasis added).

5

Whether a valid agreement to arbitrate exists is determined by state law. *See GGNSC*, 932 F.3d at 485 (citing *Arthur Andersen*, 556 U.S. at 630–31).

Then, "once *prima facie* evidence of the agreement has been presented, the burden shifts to the party opposing arbitration." *Foust v. Comcast Corp.*, No. 3:19-CV-173-HSM-DCP, 2020 WL 1891755, at *4 (E.D. Tenn. Jan. 28, 2020) (citation omitted); *see also Merritt v. Square Cap., LLC*, No. 2:24-CV-2196-TLP-ATC, 2024 WL 4183316, at *4 (W.D. Tenn. July 25, 2024) ("the burden then shifts to [the party opposing arbitration] to show that the arbitration agreement is invalid or that his claims are beyond its scope."). The party opposing arbitration may put forth "generally applicable state-law contract defenses" to the validity or enforceability of the contract, including, but not limited to, such defenses as "fraud, forgery, duress, mistake, lack of consideration or mutual obligation, or unconscionability." *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004). The court must address these issues as well, "absent a valid provision specifically committing such disputes to an arbitrator." *Granite Rock Co.*, 561 U.S. at 299.

To determine whether the existence of an agreement is "in issue," courts apply the standard for summary judgment. *See, e.g.*, *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002); *Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1001 (6th Cir. 2009); *see also Adelstein*, 728 F. Supp. 3d at ("Motions to compel arbitration are treated like motions for summary judgment.") (citing *Great Earth*, 288 F.3d at 889). Thus, a party who opposes arbitration bears the burden of demonstrating "that the validity of the agreement is 'in issue,' " which entails "show[ing] a genuine issue of material fact as to the validity of the agreement to arbitrate." *Great Earth*, 288 F.3d at 889 (quoting 9 U.S.C. § 4).

"If the district court is satisfied that the agreement to arbitrate is not 'in issue,' it must compel arbitration." *Great Earth*, 288 F.3d at 889 (citing 9 U.S.C. § 4). And if the court deems

6

arbitration appropriate, it must stay the proceedings upon a party's request. *See Fleming*, 2024 WL 4534677, at *2 n.2 (citing *Smith v. Spizzirri*, 601 U.S. 472, 477–78 (2024). If, on the other hand, the validity of the agreement to arbitrate is "in issue," the court must proceed to a trial to resolve the question. *Great Earth*, 288 F.3d at 889 (citing 9 U.S.C. § 4).

The court must view contract language regarding arbitration "in light of the strong federal policy in favor of arbitration, resolving any doubts as to the parties' intentions in favor of arbitration." *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006); *see also Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019) ("[A]mbiguities about the scope of an arbitration agreement must be resolved in favor of arbitration."); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 650 (6th Cir. 2005) ("If a dispute is even arguably within the scope of an arbitration clause, the dispute is arbitrable.").

## III.    DISCUSSION

### A.    Agreement to Arbitrate

The court must first determine whether the parties agreed to arbitrate. *Stout*, 228 F.3d at 714.

#### 1.    *Governing documents*

The plaintiffs opened a joint deposit account with Truist (then SunTrust Bank) in 2009. The deposit account, with account number ending in 7983 ("7983 Account"), remains open and active.[6] (Doc. No. 11 at 2, 5.) When the plaintiffs opened the 7983 Account, they signed a "signature card," which states that the signatories agree that "all transactions between the Bank and [the plaintiffs]" would be "governed by the rules and regulations for this account" and that

---

[6] As a general matter, the plaintiffs concede the defendant's factual assertions about their accounts and do not contest the accuracy of the related agreements, as filed by the defendant. (*See* Doc. No. 15 at 1.)

they acknowledged receipt of the same. (Doc. No. 11 at 2 (quoting Doc. No. 11-2 ("Signature Card") at 2).) The rules and regulations in effect at the time ("2009 Rules & Regulations")[7] are titled "Rules and Regulations for Deposit Accounts" and state, in relevant part: "These rules and regulations may be changed from time to time." (Doc. No. 11-2 at 5, 2009 Rules & Regulations.) The 2009 Rules & Regulations contain an arbitration agreement, which provides, in part:

> Notwithstanding any other provision in these rules and regulations, if either Depositor or the Bank has *any* preexisting, past, present or future unresolvable *dispute*, controversy or claim between us other than any Excluded Claim or Proceeding as defined below, whether founded in contract, tort, statutory or common law, regulation or otherwise, *concerning***,** *arising out of or relating to* [1] *the Account*, [2] *any transaction conducted with SunTrust* or [3] *these rules and regulations*, *including any claim regarding the applicability, interpretation, scope or validity of this arbitration clause* and/or these rules and regulations (a "Claim"), and upon the demand of either party, *it will be resolved by individual* (not class or class-wide) *binding arbitration*[.]

(*Id.* at 26–27, 2009 Rules & Regulations at 20–21) (emphasis added).

The rules and regulations governing Truist deposit accounts were updated over the years. (*See id.* at 101–25 ("2013 Rules & Regulations"); *id.* at 133–90 ("2020 Rules & Regulations").) The 2024 Rules & Regulations, which the defendant states apply to this case, had been updated in February 2024 (Doc. No. 11 at 4) and renamed "Bank Services Agreement" (Doc. No. 11-2 at 50). The 2024 Rules & Regulations state that, "You acknowledge and agree that the relationship between you and the bank created by the opening of an account is of debtor and creditor." (Doc. No. 11-2 at 53, 2024 Rules & Regulations at 1.) The 2024 Rules & Regulations also contain an arbitration agreement, which states, in relevant part:

> Upon the demand of You or us, any Claim(s) will be resolved by individual (as opposed to class, consolidated, collective, or representative) binding arbitration under the terms specified in this Mutual Arbitration Agreement. A "Claim" subject to arbitration is *any claim, cause of action, dispute, or controversy between You and us* (other than an Excluded Claim or Proceeding as defined below), whether

---

[7] The 2009 Rules & Regulations are in the record at Doc. No. 11-2 at 3–44.

preexisting, present, or future, *which arises out of or relates to* [1] the Account, [2] this Bank Services Agreement, [3] any transaction conducted with us in connection with the Account or this Bank Services Agreement, or [4] *any aspect of our relationship.* "Claim" has the broadest possible meaning and includes initial claims, counterclaims, cross-claims, third-party claims, and federal, state, local, and administrative claims. It includes disputes based in contract, tort, consumer rights, fraud, and other intentional torts, a state or the federal Constitution, statute, regulation, ordinance, common law, and equity, and includes claims for money damages and injunctive or declaratory relief.

(Doc. No. 11-2 at 54, 2024 Rules & Regulations at 2 (emphasis added).)

The 2024 Rules & Regulations make two significant departures from the 2009 Rules & Regulations in effect when the plaintiffs first opened their deposit account. First, they add a fourth category of claims that fall under the agreement's mandatory arbitration provision: "claims . . . which arise out of or relate to . . . any aspect of our relationship." Second, they delete the arbitrability-delegation clause. That is, the 2024 Rules & Regulations do not delegate to the arbitrator disputes about *whether* a claim the plaintiff litigates is subject to arbitration.[8]

The plaintiffs leased the safe deposit box at the defendant's Smyrna bank branch in 2014. (Complaint ¶ 5.) The plaintiffs' safe deposit box account is governed by the Safe Deposit Box Lease ("Box Lease") (Doc. No. 15-1 at 1–2) and the Safe Deposit Box Rules & Regulations Terms and Conditions ("Box Rules") (Doc. No. 15-1 at 5-6), neither of which, the plaintiffs correctly note, contains an arbitration agreement or incorporates one by reference. (Doc. No. 15 at 1–3.)

---

[8] *C.f. Ross v. Nissan of N. Am., Inc.*, 728 F. Supp. 3d 841, 846 (M.D. Tenn. 2024) (Richardson, J.) ("Some arbitration agreements contain a delegation provision or delegation clause . . . which is an [antecedent] agreement to arbitrate threshold issues concerning the arbitration agreement or, said differently, a contractual agreement to arbitrate arbitrability. While questions pertaining to formation [of the alleged arbitration agreement] are reserved for the court's province, those relating to enforceability and coverage are arbitrable [and must be arbitrated] in the presence of a valid delegation clause." (citations and internal quotation marks omitted) (alteration in original).

9

2. *Discussion*

The defendant argues that, when the plaintiffs opened their deposit account, they signed a signature card indicating that they had received and agreed to certain terms and conditions, which contained both an arbitration provision and a provision binding the plaintiffs to updated versions of the rules, including the applicable 2024 Rules & Regulations, which also contain an arbitration provision. (Doc. No. 11 at 9–10.) Thus, Truist argues, "it is beyond dispute that Truist and Plaintiffs formed a valid, written agreement to arbitrate." (Doc. No. 11 at 10–11.)

The plaintiffs argue that, because neither the Box Lease nor Box Rules contains an arbitration agreement, and because those terms alone govern this dispute, "it is simply impossible for Plaintiffs to have agreed to arbitration of this claim" and, therefore, that Truist "cannot even surpass the first element necessary to compel arbitration, being that 'the parties agreed to arbitrate.'" (Doc. No. 15 at 4 (quoting *Stout*, 228 F.3d at 714).)

The parties talk past each other on the *agreement* issue, and the plaintiffs elide the issues of formation (whether there is an arbitration agreement) and scope (what disputes it covers). As Truist points out, the plaintiffs do not deny that they entered into agreements containing broad arbitration provisions. (Doc. No. 17 at 1–2.) The plaintiffs have made *no* showing that calls into question whether the parties agreed to arbitrate at least some claims. Because there is no actual dispute about whether the 2024 Rules & Regulations contain a valid arbitration provision—and that the documents governing the safe deposit box do not—the court will next turn to whether the plaintiffs' claims regarding the safe deposit box fall within the scope of the deposit account's 2024 Rules & Regulations' arbitration provision.

### B. Scope

#### 1. *Truist's argument*

Truist's argument is straightforward: this dispute arises from or relates to the plaintiffs' relationship with Truist—namely leasing a safe deposit box at its bank; the plaintiffs are bound by an agreement mandating arbitration for any dispute arising from or relating to the plaintiffs' relationship with Truist; so, the parties must arbitrate this dispute. (*See* Doc. No. 10 at 1; Doc. No. 11 at 1, 11–14.) Truist's statement that the plaintiffs' claims in this case "exist only because of, and therefore clearly arise from, an aspect of Plaintiffs' relationship with Truist" (Doc. No. 11 at 13) is impossible to deny. Truist argues, therefore, that, "[g]iven the Arbitration Provision's broad language of arising out of 'any aspect of [Truist and Plaintiffs'] relationship,' it is immaterial that claims relate to a separate account or are not based explicitly on the account agreement containing the Arbitration Agreement." (Doc. No. 11 at 13–14 (citing *Drozdowski v. Citizbank, Inc.*, No. 2:15-cv-2786-STA-CGC, 2016 WL 4544543, at *8 (W.D. Tenn. Aug. 31, 2016) (alteration in original).)

#### 2. *The plaintiffs' argument*

The plaintiffs argue that claims related to their safe deposit box are governed solely by the Box Lease and the Box Rules, neither of which contains nor incorporates by reference an arbitration agreement. (Doc. No. 15 at 1–3.) As the plaintiffs put it, in the Box Lease and Box Rules, "there is no mention of the rules and regulations set forth in the Defendants' Memorandum of Law, which are applicable to deposit accounts." (*Id.* at 1.) Indeed, the Box Lease states that the lessees lease the safe deposit box "in accordance with the terms and conditions set forth in the Bank's Safe Deposit Box Rules and Regulations," and there is no mention of any other governing rules. (Doc. No. 15-1 at 1.) And, the plaintiffs argue, in the deposit account rules and regulations, there is not "a single reference to a safe deposit box." (Doc. No. 15 at 1, 3–5.) They argue that,

11

"because there are specific agreements that govern the safe deposit box, . . . the Box Rules control." (*Id.* at 3.)

The plaintiffs also point the court to Truist's Personal Services Product and Pricing Guide ("Truist Guide") (Doc. No. 15-1 at 7–45), which applies to "SunTrust accounts [like the plaintiffs'] transitioning to Truist." (Doc. No. 15 at 4.) The Truist Guide states that, "[if] you currently have a SunTrust safe deposit box, it will become a Truist safe deposit box. All terms and conditions in your Safe Deposit Lease Agreement will continue to apply." (Doc. No. 15 at 4 (quoting Doc. No. 15-1 at 32).) The plaintiffs argue that Truist therefore "plainly treats the terms and conditions of the safe Deposit Box Lease Agreement to be different and distinct from other terms and conditions related to deposit accounts." (*Id.* at 4.)

Truist does not mention the Box Lease or Box Rules in its opening brief. In reply, Truist agrees with the plaintiffs' characterization of the Box Lease and Box Rules but argues that their "lack of an arbitration provision . . . does not change the analysis of whether the arbitration provision Plaintiffs agreed to in the Operative 7983 Agreement . . . applies to their claims." (Doc. No. 17 at 2; *see also id.* at 3–4.)

### 3.  *"Broad" versus "narrow" arbitration clauses*

The Sixth Circuit "has drawn a clear line between the extensive applicability of general arbitration provisions and the more narrow applicability of arbitration clauses tied to specific disputes." *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005); *see also Willacy v. Marotta*, 683 F. App'x 468, 479 (6th Cir. 2017) (Moore, J., dissenting) ("We have distinguished between broad arbitration clauses that submit to arbitration '[a]ny controversy arising out of or relating to' an agreement and narrow arbitration clauses that limit the scope of arbitration to a fixed set of issues." (quoting *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003), then citing *Simon v. Pfizer Inc.*, 398 F.3d 765, 755 (6th Cir. 2005))). "This distinction is significant because the FAA's

12

presumption of arbitrability regarding the merits of a dispute does not apply with equal force to narrow arbitration agreements." *Turi v. Main St. Adoption Servs., LLP*, 633 F.3d 496, 507 (6th Cir. 2011) (citing *Simon*, 398 F.3d at 775), *abrogated on other grounds by Henry Schein*, 586 U.S. Courts within this circuit have alternately classified provisions requiring the arbitration of *any claim arising out of or relating to this agreement* (or superficial variations thereof) as broad,[9] very broad,[10] extremely broad,[11] and extraordinarily broad.[12]

Generally, "[w]hen faced with a broad arbitration clause, such as one covering *any* dispute arising out of an agreement, a court should follow the presumption of arbitration and resolve doubts in favor of arbitration." *Telecom Decision Makers, Inc. v. Access Integrated Networks, Inc.*, 654 F. App'x 218, 222 (6th Cir. 2016) (quoting *NCR Corp. v. Korala Assocs.*, 512 F.3d 807, 813 (6th Cir. 2008) (emphasis in *NCR Corp.*). When an arbitration clause is broad, "only an express

---

[9] *See, e.g.*, *Harvey v. Rillema*, No. 3:23 CV 1079, 2023 WL 4847691, at *4 (N.D. Ohio July 28, 2023) ("An arbitration clause containing the phrase 'any claim or controversy arising out of or relating to this agreement' is considered the paradigm of a broad arbitration clause. Such a clause generally requires arbitration of all claims touching matters covered by the agreement." (quoting *Verizon Advanced Data, Inc. v. Frognet, Inc.*, 2006 WL 2373265, at *3 (S.D. Ohio))).

[10] *See, e.g.*, *Fort Dearborn Life Ins. Co. v. Med. Mut. of Ohio*, No. 1:08-cv-433, 2008 WL 11380154, at *2 (N.D. Ohio Apr. 15, 2008).

[11] *See, e.g.*, *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 505 (6th Cir. 2007) ("[T]he arbitration clause in this case governs any controversy 'arising out of' the [agreement], and we have previously held that such an arbitration clause is 'extremely broad.'" (quoting *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 578 (6th Cir. 2003))); *Harvey*, 2023 WL 4847691, at *4 ("An arbitration clause . . . requiring arbitration of 'any dispute arising out of' an agreement is 'extremely broad.'" (quoting *First Union Real Est. Equity & Mortg. Invs. v. Crown Am. Corp.*, 23 F.3d 406, 1994 WL 151338, at *3 (6th Cir. 1994) (unpublished table decision))); *J&J Glob. Invs., L.P. v. Zip-Flyer, LLC*, No. 3:22-cv-337, 2022 WL 19714588, at *5 (E.D. Tenn. Nov. 28, 2022) ("[T]he . . . Agreement's arbitration clause includes all disputes 'arising out of the Services called for in this agreement' and therefore must be interpreted to be 'extremely broad.'" (quoting *Nestle Waters*, 505 F.3d at 505)).

[12] *See, e.g.*, *Gerber v. Riordan*, 535 F. Supp. 2d 860, 861 (N.D. Ohio 2008) ("[C]ase law gives the phrase, 'arising out of' very broad—indeed, extraordinarily broad—meaning.").

13

provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by the arbitrators." *Livingston v. Jay Livingston Music, Inc.*, No. 3:21-CV-00780, 2023 WL 4471705, at *5 (M.D. Tenn. July 11, 2023) (Crenshaw, C.J.) (quoting *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 650 (6th Cir. 2008)). Truist notes this distinction: "In construing arbitration clauses, courts have distinguished between 'broad' clauses that purport to cover all disputes 'arising out of' or 'relating to' a contract, and 'narrow clauses that limit arbitration to specific types of disputes.' Contracts requiring arbitration of any dispute arising out of or relating to an agreement, account, services provided, or the like are considered broad in scope." (Doc. No. 11 at 12 (citations omitted).) And Truist argues that the arbitration provision at issue in this case is broad. (*Id.* at 6–7, 13.)

### 4. Whether claims fall within the scope of an arbitration clause

The Sixth Circuit has set out two tests to determine whether a dispute falls within an arbitration clause's scope:

> Generally, in determining whether a specific dispute falls within the scope of a valid arbitration provision, we ask whether "[the] action could be maintained without reference to the contract or relationship at issue," looking to what the action "by necessity must describe." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003). "If such a reference is not necessary to the resolution of a particular claim, then compelled arbitration is inappropriate, unless the intent of the parties indicates otherwise." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 814 (6th Cir. 2008) (citation omitted).

> However, "where [the] parties have entered into multiple contracts as part of one overall transaction or ongoing relationship . . . [we] have adopted a more narrow test of arbitrability, examining which agreement 'determines the scope of' the contested obligations." *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 503–04 (6th Cir. 2007). "[This] question of whether and when an arbitration clause in one contract encompasses a dispute arising out of a related [contract] is less common in our case law," but our analysis remains straightforward. *Id.* at [500].

*Matalka v. Home Point Fin. Corp.*, 753 F. App'x 372, 375 (6th Cir. 2018) (alterations in original, except for the last). The Sixth Circuit has sometimes applied the broader test where parties have

14

entered into multiple contracts, and sometimes applied both tests. *See id.* at 375–76 (collecting cases and applying both the broad *Fazio* test and the narrower *Nestle Waters* test).

*Matalka* is illustrative. It concerned two employment contracts. In the first contract, which was in writing and contained an arbitration provision,[13] the plaintiff agreed to serve as the defendant's "Branch Manager." *Id.* at 373. In the second, oral contract, which did not contain an arbitration agreement, the plaintiff agreed to serve also as the defendant's "Regional Manager." *Id.* When the plaintiff sued for breach of contract and related claims under the Regional Manager contract, the defendant moved to compel arbitration under the Branch Manager contract's arbitration agreement. *Id.* at 374. The Sixth Circuit applied both the narrow *Nestle Waters* test and the broad *Fazio* test and found that the district court had properly denied the defendant's motion to compel arbitration. *Id.* at 378. Under *Nestle Waters*, the court found, the plaintiff prevailed because the Regional Manager contract determined the scope of all contested obligations. *Id.* at 375. Under *Fazio*, the court found, the plaintiff prevailed because he could maintain his action "without reference to the Branch Manager contract or Plaintiff's employment relationship with Defendant in that capacity." *Id.* (enumerating the requirements for each of the alleged causes of action and explaining why none required reference to the Branch Manager Contract or his Branch Manager employment relationship with the defendant).

If the case before this court were analyzed under either of these tests, plaintiffs would likely prevail. Under *Nestle Waters*,[14] the Box Lease and Box Rules determine the scope of all of the contested obligations. The plaintiffs allege negligent bailment (Doc. No. 1-1 ¶¶ 26–32); negligence

---

[13] The first contract's arbitration provision required arbitration of "[a]ll disputes . . . between the [parties] arising out of or relating directly or indirectly to this Agreement"). *Matalka*, 753 F. App'x at 374 n.3 (first alteration in original).

[14] The court does not address, for present purposes, whether the contracts in this case are "part of one overall transaction or relationship."

and gross negligence (*id.* ¶¶ 33–41); and breach of the contract—for violations of the Box Lease (*id.* ¶¶ 42–51.) All of these turn on obligations specified in the Box Lease and Box Rules. Under the broader *Fazio* test, the claims could be determined without reference to the deposit account's 2024 Rules & Regulations. But for the reasons discussed below, it is not clear that applying these tests in this case makes sense. In brief, existing caselaw does not countenance *such* broad arbitration clauses.

### 5. This case is an outlier

The preceding analysis does not easily fit the arbitration agreement at issue. The arbitration provision here is not like those the courts have historically referred to as "broad." Rather, it belongs to a "'relatively new and untested' species of arbitration clause, which one scholar has dubbed 'infinite arbitration clause[s].'" *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 275 (S.D.N.Y. 2021) (quoting *Mey v. DIRECTV, LLC*, 971 F.3d 284, 302 (4th Cir. 2020) (Harris, J., dissenting), then David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 639–40 (2020)). The infinite arbitration clause at issue in this case, like that in *McFarlane*, construed literally, has "striking breadth: It effectively requires arbitration of *any* dispute between a [customer] and [Truist], as well as [Truist's] parents, subsidiaries, affiliates, successors, employees, agents, and the like, whether arising now or in the future, and without regard for whether it arises from or relates to the [deposit account] agreement of which it is part." *Id.* at 269.

Courts have not had extensive occasion to review such clauses.[15] But "[m]any courts have already declined to enforce exceptionally broad arbitration clauses or to interpret them to reach

---

[15] *Accord, e.g., Mey v. DIRECTV, LLC*, No. 5:17-cv-179, 2021 WL 973454, at *8 (N.D.W. Va. Feb. 12, 2021) ("There is, in fact, almost no case law addressing such broad arbitration clauses."); *McFarlane*, 524 F. Supp. 3d at 275 ("Underscoring the relative novelty of 'infinite arbitration clauses,' there is relatively little case law addressing them.").

16

absurd results." *Davitashvili v. Grubhub Inc.*, No. 23-521-CV, 2025 WL 798378, at *12 (2d Cir. Mar. 13, 2025) (Pérez, J., concurring); *see id.* at *12 n.6 (collecting cases). One court has refused to enforce an infinite arbitration clause because of lack of mutual assent. *See Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) ("Notwithstanding the literal meaning of the clause's language, no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider . . . ."). Others have regarded such clauses as unconscionable. *See, e.g.*, *McFarlane*, 524 F. Supp. 3d at 278–79 (" "[W]hether as a matter of contract formation or unconscionability, . . . the Arbitration Provision does not apply to Plaintiffs' claims to the extent that they lack any nexus to the [agreement containing it]."); *cf. In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1263 (S.D. Cal. 2012) (reasoning that an arbitration clause covering "any and all disputes," even those "not limited to disputes arising from or related to the transaction or contract at issue," would "clearly be unconscionable"). Still other courts have found that infinite arbitration clauses license absurd results. To borrow from Judge Richard Posner, under the arbitration clause in the 2024 Rules & Regulations, "if an employee of [Truist] picked [Ahmad's] pocket when she came in to [examine her safe deposit box], and [Ahmad] sued the employee for conversion, [that employee] would be entitled to arbitration of her claim."[16] *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003).

---

[16] Within the 2024 Rules & Regulation's Mutual Arbitration Agreement and below the section entitled "Requirement to Arbitrate" is a section entitled "Special Definition of 'We,' 'Us,' 'Our,' and 'Parties.'" In relevant part, this subsection states:

> the terms "Truist," "we," "us," "our," and "Parties," in addition to the meanings set forth in this Bank Services Agreement, also refer to Truist Bank and its employees, agents, officers, directors, parents, controlling persons, subsidiaries, affiliates, predecessors, successors, and assigns.

(Doc. No. 11-2 at 53, 2024 Rules & Regulations at 2.)

While courts within this circuit have encountered infinite arbitration clauses, the claims at issue usually arose from the contract that contained the arbitration clause, such that the provisions' infinitude was not at issue. *See, e.g.*, *Sifuentes v. AT&T*, No. 1:23-CV-834, 2024 WL 3391147, at *1 (W.D. Mich. July 5, 2024) (compelling arbitration where plaintiffs alleged a data breach related to their wireless telecommunication service contract, which contained an arbitration agreement to "arbitrate all disputes and claims between us" (citation omitted)), *R. & R. adopted*, No. 1:23-CV-834, 2024 WL 3398309 (W.D. Mich. July 12, 2024); *Keyes v. AT&T*, No. CV 14-153-ART, 2015 WL 13768167, at *1 (E.D. Ky. June 22, 2015) (compelling arbitration of the plaintiff's claim against AT&T for disconnecting service because the parties had agreed to arbitrate all "claims arising out of or relating to any aspect of the relationship"); *Anderson*, 490 F. Supp. 3d at 1276–77 (compelling arbitration where the parties agreed to arbitrate "all disputes arising out of or related to . . . any aspect of the relationship between you and [the defendant]" and the plaintiff's claims related to the purchase of an item that required him to agree to the terms of service containing the at-issue arbitration clause (citation omitted)); *Adelstein*, 728 F. Supp. 3d at 769 (compelling arbitration and finding that claims relating to discrepancies between online and in-store prices "fall within [the] scope" of an arbitration clause requiring the arbitration of "all disputes arising out of . . . any aspect of the relationship between [the user] and Walmart" (citation omitted, alteration in original, some text un-capitalized)).

Truist argues that the arbitration clause at issue fits comfortably within existing caselaw discussing "broad" arbitration agreements. (*See* Doc. No. 11 at 11–14.) As Truist states, "the Arbitration Provision is clearly a broad one because it covers 'any claim . . . which arises out of or relates to . . . any aspect of our relationship.'" (*Id.* at 13.) Further, according to Truist, "[c]ourts routinely compel arbitration of claims like the ones in this lawsuit . . . finding that such claims

against a financial institution arise from or relate to its relationship with the plaintiff." (*Id.* (collecting cases).) Truist cites several cases—only some of which actually support its position. Two of the cases Truist cites are irrelevant because the claims at issue related to the contracts that contained the arbitration clause. *See Shepard v. Credit One Bank*, No. 3:22-CV-01032, 2023 WL 3937439, at *3, 5–6 (M.D. Tenn. June 9, 2023) (Newbern, M.J.), *R. & R. adopted*, No. 3:22-CV-01032, 2023 WL 4306679 (M.D. Tenn. June 30, 2023) (Crenshaw, C.J.); *Best Dev. & Const. Corp. v. Amsouth Bank*, No. 3:05-CV-251, 2005 WL 3216264, at *2 (E.D. Tenn. Nov. 29, 2005). Two other in-circuit cases Truist cites do appear to apply infinite arbitration clauses according to their terms. *See Regions Bank v. Chanda*, No. 11-2296-STA, 2011 WL 4352722, at *6–7 (W.D. Tenn. Sept. 16, 2011) (finding that deposit-account agreements' arbitration clause covering any "transaction, business, contact, interaction or relationship" was so broad as to apply to claims arising from an unrelated escrow account); *Drozdowski*, 2016 WL 4544543, at *7–9 (finding that an expansive arbitration clause governed the plaintiffs' claims under the Telephone Consumer Protection Act, even though the bank's calls to one spouse related to an account held solely by the other spouse).

In any event, such an expansive arbitration clause does not fit within the Sixth Circuit's scheme for determining its scope. The very *point* of infinite arbitration clauses, like this one, it seems, is to preempt such scope considerations.[17]

---

[17] "Indeed, they attempt to suck into their maw *all* causes of action—no matter their source." David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 679 (2020) (emphasis in original).

19

"If clear, the plain meaning of the statutory language controls." *Apogee Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 112 F.4th 343, 354 (6th Cir. 2024) (quoting *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004)).

The FAA's Section 2 "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the act." *Moses H. Cone*, 460 U.S. at 24. "The FAA applies to '[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract.'" *Stutler v. T.K. Constructors Inc.*, 448 F.3d 343, 345 (6th Cir. 2006) (quoting 9 U.S.C. § 2); *accord Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 652 n.4 (2022) ("'[A]rising out of' language normally refers to a causal relationship." (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 361–62 (2021)).

"[Sections] 3 and 4 of the Act often require a court to stay litigation and compel arbitration 'accord[ing] to' the terms' of the parties' agreement. But this authority doesn't extend to *all* private contracts, no matter how emphatically they may express a preference for arbitration." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 110 (2019) (emphasis in original). Indeed, "antecedent statutory provisions," including Section 2, "limit the scope of the court's powers under §§ 3 and 4." *Id.* That is, "[w]hile a court's authority under the [FAA] to compel arbitration may be considerable, it isn't unconditional." *Id.* Rather, "the terms of § 2 limit the FAA's enforcement mandate to agreements to arbitrate controversies that 'arise out of' the parties' contractual relationship." *Viking River Cruises, Inc.*, 596 U.S. at 652 n.4; *see also Davitashvili*, 2025 WL 798378, at *7 ("The FAA's scope is limited to 'agreements to arbitrate controversies that "arise out of" the parties' contractual relationship.'" (quoting *Viking River*, 596 U.S. at 652 n.4)).

More pointedly, the Second Circuit panel in *Davitashvili* "agree[d] unanimously" that "Section 2 . . . applies *only* to contracting parties' agreements to arbitration claims '*arising out of such contract* or transaction.'" 2025 WL 798378, at *9 (Pérez, J., concurring) (emphasis added). The same panel also "agree[d] unanimously that one consequence of that principle is that the FAA does not countenance motions to compel arbitration of claims that lack a requisite 'nexus' to the contract containing the arbitration clause." *Id.* (citations omitted); *cf. Mey*, 971 F.3d at 305 (Harris, J., dissenting) ("[T]he FAA . . . mandates enforcement not of all arbitration agreements, but only agreements set forth in 'a contract . . . to settle by arbitration a controversy thereafter *arising out of such contract* or transaction." (quoting 9 U.S.C. § 2) (emphasis in original)). That is, "when the dispute is wholly unrelated to the contract, the FAA is silent; federal courts have no power to compel arbitration." *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 723–24 (9th Cir. 2020) (O'Scannlain, J., concurring) (citing David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 678–83 (2020); Stephen E. Friedman, *The Lost Controversy Limitation of the Federal Arbitration Act*, 46 U. Rich. L. Rev. 1005, 1006 (2012)); *see also Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1213 (11th Cir. 2021) ("'[T]he "arising out of" language in § 2 . . . confines the FAA's application to the arbitration of controversies with a sufficiently close 'relationship' to the underlying contract." (quoting *Revitch*, 977 F.3d at 722 (O'Scannlain, J., concurring)); *accord Runzi v. Synchrony Bank*, 713 F. Supp. 3d 1360, 1364 (N.D. Ga. 2024) ("[T]he FAA applies only to controversies that arise out of the contract that contains the arbitration clause."), *appeal dismissed*, No. 24-10319-HH, 2024 WL 3504462 (11th Cir. May 7, 2024); *McFarlane*, 524 F. Supp. 3d at 278 ("[T]o the extent that the Arbitration Provision purports to require arbitration of claims wholly unrelated to the contract in which it is contained, it is arguably not even subject to the FAA and its policy favoring arbitration.").

Put another way, "a defendant may not compel arbitration of claims that are 'completely unrelated' to the underlying . . . contract in which the agreement to arbitrate was made." *Davitashvili*, 2025 WL 798378, at *12 (Sullivan, J., concurring in part and dissenting in part) (quoting *Revitch*, 977 at 722 (O'Scannlain, J., concurring)). "This means," Judge Sullivan continued, "that, at least in some cases, a dispute will be so untethered from the parties' initial transaction that the FAA . . . will not apply[.]" *Id.* at *13 (Sullivan, J.). That is the case here.

Even assuming that the plaintiffs' claims arise out of or relate to their relationship with Truist, the dispute between the plaintiffs and Truist in this case simply does not "arise[] out of" a contract containing a "written provision . . . to settle by arbitration a controversy." 9 U.S.C. § 2. The claims at issue here deal exclusively with the plaintiffs' safe deposit box. The Box Lease and Box Rules do not mention arbitration or incorporate by reference any other agreements. The 2024 Rules & Regulations, which contain the arbitration agreement, concern deposit accounts and do not mention, contemplate, or require leasing safe deposit boxes. Moreover, Truist has not stated, and nothing in the record indicates, that leasing a Truist safe deposit box requires opening a deposit account or any other Truist account. Even if the claims in this case fall within the arbitration agreement's scope, the court cannot compel arbitration or stay the case under the FAA.

## IV. CONCLUSION

For the foregoing reasons, the defendant's Motion to Compel Arbitration and Stay Case will be denied.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

22